UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

ILLINOIS FARMERS INSURANCE
COMPANY; 21ST CENTURY
INSURANCE COMPANY; and BRISTOL
WEST CASUALTY INSURANCE
COMPANY,

Plaintiffs,

v.

MOBILE DIAGNOSTIC IMAGING, INC.;
MICHAEL A. APPLEMAN; STEVE
POSER, D.C.; ELITE HEALTH
CHIROPRACTIC, P.C.; AFFINITY
HEALTH CHIROPRACTIC, P.A.; ASSIAT
BOKE, D.C.; ASSIAT BOKE
CHIROPRACTIC, P.A.; RICHARD
OTTOMEYER, D.C.; OTTOMEYER
CLINICS, PLLC; DANIAL HALL, D.C.;
LOIS HALL, D.C.; HALL FAMILY
CHIROPRACTIC CLINIC; JOHN
VALENTINI, D.C.; MICHAEL B.
SHINDER, D.C.; FOUR SEASONS
CHIROPRACTIC, LTD.; MATEUS
FERRAZ-SOUZA, D.C.; UNIVERSAL
CARE CLINICS, INC.; DANIEL G.
ANDERSON, D.C.; ANDERSON
CHIROPRACTIC CLINIC, P.A.; JEFFREY
DANIELSON, D.C.; NORTHERN LIFE
CHIROPRACTIC, P.A.; ANDREA
RUHLAND, D.C.; LAKEVILLE FAMILY
CHIROPRACTIC, LTD.; RICHARD
STOFFELS, D.C.; STOFFELS
CHIROPRACTIC, LTD.; LOWELL
MAGELSSEN, D.C.; FIRST
CHIROPRACTIC — SHOREVIEW; ROBIN
HARSTAD, D.C.; OVERSTAD
CHIROPRACTIC, P.A.; JEFF SCHNEIDER,
D.C.; HILLSIDE CHIROPRACTIC CLINIC,
INC.; DOROTHY SAUNDERS, D.C., a/k/a
Dorothy O'Connor; TEAM

Case No. 13-CV-2820 (PJS/TNL)

ORDER

CHIROPRACTIC & WELLNESS CENTER,
LTD.; STEVEN MOE, D.C.; INTEGRATED
HEALTH AND WELLNESS, LTD.; SHAUN
GIFFORD, D.C.; PRO ADJUSTER
CHIROPRACTIC; SCHEIDEMAN
CHIROPRACTIC & BODY SHOP, INC.;
BRENT SCHEIDEMAN, D.C.; KATHLEEN
A. BLOOM, D.C.; BLOOM
CHIROPRACTIC CENTER, P.A.; SCOT
PEARSON, D.C.; PEARSON
CHIROPRACTIC CLINIC; AARON
KIRKING, D.C.; SPINAL HEALTH;
MICHAEL LAMPPA, D.C.; ACTIVE LIFE
CHIROPRACTIC; LAMPPA
CHIROPRACTIC, P.A.; ALLEN TRAN,
D.C.; PRESTIGE CHIROPRACTIC, P.A.;
DENIS BOERJAN, D.C.; ADVANCE
CHIROPRACTIC CLINIC; DENIS
BOERJAN, LLC; CARRON PERRY, D.C.;
CANDACE SALMI, D.C.; BODYMIND
CHIROPRACTIC CENTER; BRENT
KVAM, D.C.; HEALTHSTAR
CHIROPRACTIC CENTER, P.A.;
STEPHAN M. DEHAVEN, D.C.;
DEHAVEN CHIROPRACTIC CLINIC;
DEHAVEN CHIROPRACTIC CLINIC,
INC.; DEREK JOHNSON, D.C.;
WELLNESS TEAM OF NISSWA;
CYNTHIA STARBUCK, D.C.; HEALING
HANDS WELLNESS CENTER, LLC;
JOSEPH VIRGA, D.C.; KATHLEEN
VIRGA, D.C.; VIRGA CHIROPRACTIC
CLINIC, P.A.; MARK REEVE, D.C.;
REEVE CHIROPRACTIC CLINIC, P.A.;
DOUGLAS EDWARDS, D.C.; ALBERT
LEA CHIROPRACTIC, PLC; MICHAEL
KILPATRICK, D.C.; NEW PRAGUE
FAMILY CHIROPRACTIC; STEPHEN L.
ENGEL, D.C.; and ENGEL
CHIROPRACTIC, P.A.,

Defendants.

Bradley L. Doty, Richard S. Stempel, and Jesse W. Busta, STEMPEL & DOTY, PLC, for plaintiffs.

Kristen G. Marttila, David W. Asp, and Eric C. Tostrud, LOCKRIDGE GRINDAL NAUEN PLLP, for defendants Mobile Diagnostic Imaging, Inc. and Michael A. Appleman.

Thomas D. Jensen, Amy Elizabeth Lanser, and Thomas J. Evenson, LIND, JENSEN, SULLIVAN & PETERSON, P.A., for defendants Steve Poser, D.C.; Elite Health Chiropractic, P.C.; Affinity Health Chiropractic, P.A.; Assiat Boke, D.C.; and Assiat Boke Chiropractic, P.A.

Plaintiffs Illinois Farmers Insurance Company ("Illinois Farmers"), 21st Century Insurance Company ("21st Century"), and Bristol West Casualty Insurance Company ("Bristol West") allege that defendant Michael A. Appleman — acting through his corporation, defendant Mobile Diagnostic Imaging, Inc. ("MDI") — paid kickbacks to several dozen chiropractors and chiropractic clinics. In return, the chiropractors and clinics referred patients to MDI for magnetic resonance imaging ("MRI") scans. After performing the scans, MDI and Appleman submitted insurance claims to plaintiffs for reimbursement under the Minnesota No-Fault Automobile Insurance Act ("No-Fault Act"), Minn. Stat. §§ 65B.41-65B.71, and plaintiffs paid the claims. Plaintiffs allege, however, that they would not have paid those claims if they had known about the kickback scheme.

Plaintiffs also allege that Appleman — who is not a doctor or a chiropractor or otherwise licensed to practice medicine — is barred under Minnesota law from owning MDI because, plaintiffs say, MDI is a corporation that engages in the practice of medicine. Plaintiffs allege that they would have denied the claims submitted by MDI if they had known that MDI was owned by a layperson.

Finally, plaintiffs allege that, because the alleged kickback scheme created an incentive for chiropractors to refer patients to MDI for MRI scans, the "bribed" chiropractors referred patients who did not have a medical need for an MRI scan. According to plaintiffs, this caused them to pay for medically unnecessary scans, and they are entitled to reimbursement for those payments.

Plaintiffs have filed a 56-page, 283-paragraph, 14-count complaint against MDI, Appleman, and dozens of chiropractors and chiropractic clinics, seeking to recover every penny that they paid on every claim submitted by MDI over a five-year period. Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; under both federal and state anti-kickback statutes; under the No-Fault Act; and under a host of other laws and doctrines.

"This Court has repeatedly criticized the filing of 'kitchen-sink' or 'shotgun' complaints — complaints in which a plaintiff brings every conceivable claim against every conceivable defendant." *Gurman v. Metro Hous. & Redev. Auth.*, 842 F. Supp. 2d 1151, 1153 (D. Minn. 2011) (collecting cases). One reason why kitchen-sink complaints are so often criticized is that they "unfairly burden defendants and courts" by "shift[ing] onto the defendant and the court the burden of identifying the plaintiff's genuine claims and determining which of those claims might have legal support." *Id.* Unfortunately, plaintiffs in this case failed to heed the warnings of this Court, and thus it is now necessary for the Court and the defendants to undertake an onerous, claim-by-claim march through the lengthy complaint to try to separate the wheat from the chaff.

Three groups of defendants have moved to dismiss the complaint:  (1) MDI and

Appleman; (2) Steve Poser and two of his chiropractic clinics (Elite Health Chiropractic, P.C.

("Elite Health") and Affinity Health Chiropractic, P.A. ("Affinity Health")); and (3) Assiat Boke

and her chiropractic clinic (Assiat Boke Chiropractic, P.A.).  This matter is before the Court on

those motions to dismiss.  *See* ECF Nos. 108 & 112.  For the reasons that follow, the motions are

granted, and the complaint is dismissed as to the moving defendants.

## I.  FACTS[1]

MRI scans are often needed to diagnose neck and back injuries.  Compl. ¶ 47 [ECF

No. 1].  MRI machines are expensive, however, and thus many chiropractors do not own them.

When a patient of such a chiropractor requires an MRI scan, the chiropractor will refer the

patient to another person or company to perform the scan.  MDI is one such company.

Unlike many companies that perform MRI scans, MDI does not keep its MRI machine at

a fixed location.  Instead, MDI transports its MRI machine on a large trailer, and thus MDI can

perform scans at locations that are convenient for a referring chiropractor's patients — such as in

the parking lot outside of the chiropractor's office.  *See id.* ¶ 22.  After conducting MRI scans,

MDI "engages the services" of radiologists "to interpret the scans performed on the patients

---

[1]The Court assumes — as it must in ruling on a motion brought under Fed. R.
Civ. P. 12(b)(6) — that the factual allegations pleaded in the complaint are true.  *See Aten v.
Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008).  Poser, Boke, and their clinics also move
to dismiss certain claims under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction.
When a defendant makes a so-called "facial attack" under Rule 12(b)(1) — that is, when the
defendant argues that the court does not have subject-matter jurisdiction based on the facts as
they are alleged in the complaint — the court treats the factual allegations in the complaint as
true and determines whether those allegations are sufficient to establish subject-matter
jurisdiction.  *See Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990); *Menchaca v.
Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).

. . . ." *Id.* ¶ 122.  An interpretative report signed by a radiologist is then forwarded to the

referring chiropractor, and the chiropractor, in turn, discusses the report with the patient.  *Id.*

¶¶ 25-26.

MDI is just one of many companies that provide MRI-scanning services in a competitive

industry.  Because its business model relies on referrals from chiropractors, MDI (through its

owner, Appleman[2]) cultivates relationships with chiropractors in an effort to encourage them to

refer patients to MDI.  For example, Appleman allows students at local chiropractic colleges to

vacation at his property in the Cayman Islands.  *Id.* ¶ 49.  He also sends gift baskets, flowers, and

other tokens of appreciation to practicing chiropractors.  *Id.* ¶ 50.  These types of enticements are,

of course, common in the business world.

According to plaintiffs, however, MDI used a more pernicious way to give chiropractors

an incentive to refer patients to MDI.  Under "Confidential Rental Agreement[s]" reached

between MDI and referring chiropractors, MDI paid a "use fee" of several hundred dollars to the

chiropractors or their clinics, ostensibly for the "use of the [chiropractors'] premises, equipment,

personnel, services, and supplies for a scanning day."  Compl. Ex. 3 [ECF No. 1-1 at 3] (example

of Confidential Rental Agreement).  Plaintiffs characterize this "use fee" as a thinly disguised

kickback to chiropractors in return for their referral of patients to MDI.  Both the payment and

---

[2]Plaintiffs acknowledge in their briefing that Appleman's wife — and not Appleman — owns 100% of the shares of MDI.  *See* ECF No. 141 at 8.  Plaintiffs contend that due to his wife's ownership, Appleman himself is deemed a "beneficial owner" of MDI under Minnesota law.  ECF No. 141 at 9; *see also* Minn. Stat. § 302A.011, subd. 41(b).  Appleman does not dispute, for purposes of his Rule 12(b)(6) motion, that he is an owner of MDI.  For the sake of clarity, the Court will refer to Appleman himself as the owner of MDI.

the receipt of such kickbacks are illegal under Minnesota and federal law.  *See* Minn. Stat.

§ 62J.23; 42 U.S.C. § 1320a-7b(b)(1).

When a chiropractor refers a patient who has been injured in a car accident for a scan,

MDI asks the patient to sign a medical lien requiring the patient to pay MDI's bill out of any

settlement of the patient's insurance claim.  *See* Compl. ¶ 30.  MDI then submits a health-

insurance-claim form — known as a CMS 1500 form[3] — to the patient's automobile insurer for

reimbursement of the cost of the MRI scan.  *See id.* ¶ 41; Minn. Stat. § 62J.52, subd. 2(a) (2008)

(requiring that "all noninstitutional health care services . . . must be billed using the health

insurance claim form CMS 1500 . . . .").  Those forms require that the person seeking

reimbursement include certain information, such as the patient's name, address, and insurance

status; the medical services provided to the patient; and the charges associated with those

services.  *See* Compl. ¶ 39; Compl. Ex. 11 [ECF No. 1-1 at 81] (example of form completed by

MDI).

Plaintiffs issue automobile insurance in Minnesota.  *See* Compl. ¶¶ 9, 236.  The State of

Minnesota, through the No-Fault Act, provides a statutory framework "to encourage appropriate

medical and rehabilitation treatment of the automobile accident victim by assuring prompt

payment for such treatment . . . ."  Minn. Stat. § 65B.42(3).  For example, the No-Fault Act

requires automobile insurers to reimburse insureds for "all reasonable expenses for necessary . . .

medical, surgical, x-ray, optical, dental, chiropractic, and rehabilitative services . . . ."

Minn. Stat. § 65B.44, subd. 2.  Plaintiffs paid at least $553,673.99 to MDI and Appleman in

---

[3]The complaint refers to these forms as "HCFA-1500 forms."  Compl. ¶ 41.  This is the
previous name for the form now known as the CMS 1500 form.  *See* 2005 Minn. Laws ch. 106,
§ 4.

response to CMS 1500 forms submitted by those defendants between 2008 and 2013.  Compl.

¶ 183; Compl. Ex. 7 [ECF No. 1-1 at 44-70].

Plaintiffs allege that, whenever MDI and Appleman submitted a claim to an insurer, they

at least implicitly represented to the insurer that they were entitled to receive payment on the

claim.  These representations were fraudulent (say plaintiffs) for three reasons:

First, plaintiffs contend that Appleman's ownership of MDI violated Minnesota's

corporate-practice-of-medicine doctrine ("CPMD"), as MDI practiced medicine, and as

Appleman was not a licensed medical practitioner.  *See* Compl. ¶ 121; *Granger v. Adson*, 250

N.W. 722, 722-24 (Minn. 1933) (describing the CPMD under Minnesota law).  Plaintiffs contend

that Appleman knew that he was not permitted to own MDI, and therefore he knew that MDI was

not entitled to be paid for the claims that it submitted.  By representing to plaintiffs that MDI was

entitled to payment, plaintiffs argue, MDI and Appleman committed fraud, and any amounts paid

to them should be returned to plaintiffs.

Second, as described above, plaintiffs allege that MDI paid kickbacks to chiropractors in

return for patient referrals.  Plaintiffs argue that MDI and Appleman knew that, because they had

paid kickbacks, they were not entitled to payment of any claim related to any patient of any of the

bribed chiropractors.  Again, by representing to plaintiffs that MDI was entitled to payment, MDI

and Appleman committed fraud, and plaintiffs are entitled to recover all amounts paid to them.

Third, plaintiffs allege that the kickback scheme provided an incentive for chiropractors

to refer patients to MDI for scans that were not medically necessary.  The No-Fault Act requires

plaintiffs to pay for scans only if the scans are medically necessary and reasonably priced.  *See*

Minn. Stat. § 65B.44, subd. 2.  By submitting CMS 1500 forms on behalf of patients who did not

need MRI scans, say plaintiffs, MDI and Appleman fraudulently induced plaintiffs to pay claims that they had no obligation to pay.

Based on these allegations, plaintiffs have sued MDI, Appleman, numerous chiropractors alleged to have participated in the kickback scheme, and numerous clinics owned by those chiropractors. MDI and Appleman now move to dismiss all claims brought against them. Similar motions have been filed by Poser and Boke and their clinics.

## II.  ANALYSIS

### A.  Standard of Review

Under Fed. R. Civ. P. 12(b)(6), a court must accept as true a complaint's factual allegations and draw all reasonable inferences in the plaintiff's favor. *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008). Although the plaintiffs' factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). In assessing a claim's plausibility, the Court may disregard any allegation that is conclusory. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that "conclusory" allegations "are not entitled to the assumption of truth").

### B.  Minn. Stat. § 65B.525

Before turning to plaintiffs' substantive allegations, the Court must address whether and to what extent it has subject-matter jurisdiction over this lawsuit.

Each of the insurance claims submitted by MDI was for less than $10,000; in fact, it appears that none of the claims exceeded $3,000. *See* Compl. Ex. 7. Under the No-Fault Act,

> [t]he Supreme Court and the several courts of general trial
> jurisdiction of this state shall by rules of court or other
> constitutionally allowable device, provide for the mandatory
> submission to binding arbitration of all cases at issue where the
> claim at the commencement of arbitration is in an amount of
> $10,000 or less against any insured's reparation obligor for no-fault
> benefits or comprehensive or collision damage coverage.

Minn. Stat. § 65B.525, subd. 1.

"Generally, arbitration law states that arbitrators are the final judges of both law and

fact." *Johnson v. Am. Family Mut. Ins. Co.*, 426 N.W.2d 419, 421 (Minn. 1988). But arbitration

under the No-Fault Act is an exception. "[N]o-fault arbitrators are limited to deciding questions

of fact, leaving the interpretation of law to the courts." *Weaver v. State Farm Ins. Cos.*, 609

N.W.2d 878, 882 (Minn. 2000) (citing *Johnson*, 426 N.W.2d at 421). This limitation is

jurisdictional; Minnesota state courts lack subject-matter jurisdiction over factual issues related

to an insurance claim that is subject to mandatory arbitration under the No-Fault Act. *Ill.

Farmers Ins. Co. v. Glass Serv. Co.*, 683 N.W.2d 792, 800 (Minn. 2004).

Defendants argue that, under the No-Fault Act, this Court does not have jurisdiction over

any claim whose viability depends on a factual finding that an MRI scan conducted by MDI was

not medically necessary. Instead, say defendants, any dispute relating to the medical necessity of

an MRI scan conducted by MDI must be resolved by an arbitrator. And because (according to

defendants) the Court lacks jurisdiction to find that any particular MRI scan was not medically

necessary, any claim founded on the purported lack of medical necessity of an MRI scan must be

dismissed at the outset.

Unfortunately, the No-Fault Act is not a model of clarity on the subject of mandatory

arbitration, and Minnesota courts have not said much about the arbitration provision. In the

usual case, the statute is invoked after an insurer fails to pay a claim.  *See In re the Claims for No-Fault Benefits Against Progressive Ins. Co.*, 720 N.W.2d 865, 870-71 (Minn. Ct. App. 2006). It does not appear that § 65B.525 has ever been successfully invoked in a case in which an insurer seeks to recover money that it has already paid on a claim.  In fact, at least one court has found (albeit in a different context) that claims brought by insurers for reimbursement of claim payments would not be governed by § 65B.525.  *See Viking Ins. Co. v. Clayburn*, No. CX-97-371, 1997 WL 396220, at *2 (Minn. Ct. App. July 15, 1997).

Moreover, it is not obvious from the language of the statute that the legislature intended that arbitrators decide factual disputes when insurers seek restitution after allegedly being defrauded.  The statute requires arbitration of claims "against any insured's reparation obligor for no-fault benefits or comprehensive or collision damage coverage."  Minn. Stat. § 65B.525, subd. 1.  This lawsuit does not involve any "claim" for "no-fault benefits or comprehensive or collision damage coverage" against an "insured's reparation obligor."  Thus, it is not clear why § 65B.525 would apply to this litigation.

Finally, this lawsuit includes claims over which the Court has original jurisdiction, such as the civil RICO claim, which is brought under federal law.  The Court very much doubts that the Minnesota Legislature can deprive a federal court of the authority to make the factual findings necessary to adjudicate claims under federal law.

Fortunately, the Court need not address these issues in order to rule on the pending motions.  Even on defendants' reading, the No-Fault Act deprives the Court only of jurisdiction to decide factual issues relating to the medical necessity of the MRI scans done by MDI.  But the Court need not decide any such factual issues at this time.  The question of whether plaintiffs'

complaint states a claim upon which relief can be granted is answered by examining the face of the complaint, assuming that all factual allegations are true, and applying the law to those assumed-to-be-true allegations.  The pending motions require the Court to resolve legal disputes, not factual disputes, and no one contends that § 65B.525 deprives this Court of jurisdiction to decide legal disputes.

### C.  Federal Claims

### 1.  RICO (Count Three)

Section 1962(c) of Title 18 makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  Despite this broad language — and despite the frequency with which civil RICO claims are tossed into kitchen-sink complaints — "RICO 'does not cover all instances of wrongdoing.  Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity.'"  *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (quoting *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006)).  Although RICO is a criminal statute, § 1964(c) provides a civil remedy for "[a]ny person injured in his business or property by reason of a violation of" the law's substantive provisions.

To plead a viable RICO claim, a plaintiff must allege "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Wisdom v. First Midwest Bank of Poplar Bluff*, 167 F.3d 402, 406 (8th Cir. 1999) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).  The elements of a RICO claim must be pleaded with respect to each individual defendant.  *See Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001,

1027 (8th Cir. 2008). When the alleged racketeering activity is fraud, the elements of a RICO

claim must be pleaded with particularity under Fed. R. Civ. P. 9(b). *See Crest Constr. II*, 660

F.3d at 353.

Plaintiffs allege that MDI and Appleman formed 13 separate association-in-fact

enterprises with chiropractors and chiropractic clinics in Minnesota and Wisconsin. *See* Compl.

¶¶ 142-55. One of those enterprises is alleged to have been formed with Boke and Assiat Boke

Chiropractic, P.A., while another is alleged to have been formed with Poser, Elite Health, and

Affinity Health. *Id*. ¶¶ 143-44.

As explained below, the Court finds that the RICO claim fails for two reasons. First,

plaintiffs have not adequately pleaded the commission of predicate acts from which a pattern of

racketeering activity could be found. Second, plaintiffs have not pleaded facts showing that the

alleged enterprises had a structure that was separate and distinct from the racketeering activity

itself. *See Crest Constr. II*, 660 F.3d at 354-55. Accordingly, the RICO claim is dismissed.

### a. Predicate Acts

A pattern of racketeering activity "is shown through two or more related acts of

racketeering activity that 'amount to or pose a threat of continued criminal activity.'" *Nitro

Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009) (quoting *Wisdom*, 167

F.3d at 406). RICO defines "racketeering activity" as the commission of any of several predicate

offenses. *See* 18 U.S.C. § 1961(1). Among those predicate offenses are mail fraud and wire

fraud. *See* 18 U.S.C. § 1341 (mail-fraud statute); 18 U.S.C. § 1343 (wire-fraud statute).

Plaintiffs contend that each of the alleged association-in-fact enterprises, acting through

MDI and Appleman, submitted fraudulent insurance claims under the No-Fault Act in violation

of the mail-fraud and wire-fraud statutes.  These insurance claims constitute the predicate acts upon which the alleged pattern of racketeering activity is based.  If plaintiffs have not adequately pleaded facts showing that the insurance claims were fraudulent, then plaintiffs have failed to adequately allege a pattern of racketeering activity — an essential element of their RICO claim. *See Wisdom*, 167 F.3d at 406.

As noted, plaintiffs allege that the insurance claims submitted by MDI and Appleman were fraudulent.  Proof of fraud, of course, requires proof of deception or dishonesty.  Plaintiffs argue, in essence, that each time that MDI and Appleman submitted a claim to an insurer, MDI and Appleman implicitly represented that they were entitled to payment of that claim, and implicit in that implicit representation was the representation that they had not violated any laws. Plaintiffs allege that this implicit assertion within an implicit assertion was fraudulent for three reasons.  First, plaintiffs allege that Minnesota's CPMD forbade Appleman from owning MDI, and that Appleman's ownership of MDI precluded MDI and Appleman from being reimbursed for insurance claims under the No-Fault Act.  Second, plaintiffs allege that MDI and Appleman paid kickbacks to referring chiropractors and thus were not entitled to reimbursement for any claims related to the patients of those chiropractors.  And third, plaintiffs allege that MDI and Appleman submitted insurance claims for MRI scans that were not medically necessary and therefore not reimbursable under the No-Fault Act.  The Court will consider these arguments in turn.

### i.  CPMD

Minnesota law prohibits "the corporate practice of health care professions . . . ."  *Isles Wellness, Inc. v. Progressive N. Ins. Co.* ("*Isles Wellness I*"), 703 N.W.2d 513, 518 (Minn. 2005).  "Among the public policy considerations in applying the corporate practice of medicine doctrine are 'concerns raised by the specter of lay control over professional judgment, commercial exploitation of health care practice, and the possibility that a health care practitioner's loyalty to a patient and an employer will be in conflict.'"  *Isles Wellness, Inc. v. Progressive N. Ins. Co.* ("*Isles Wellness II*"), 725 N.W.2d 90, 93 (Minn. 2006) (quoting *Isles Wellness I*, 703 N.W.2d at 517).  Plaintiffs allege that MDI is engaged in the practice of medicine; that Appleman is not licensed to practice medicine; that Appleman's ownership of MDI therefore violates the CPMD; and that the submission of insurance claims by MDI and Appleman constituted predicate acts of mail or wire fraud under RICO because each time they submitted a claim, they represented to the insurer that they were entitled to payment when, in fact, they knew that they were not entitled to payment because of their violation of the CPMD.

MDI and Appleman do not dispute that Appleman is not licensed to practice medicine.  They do, however, dispute that MDI is engaged in the practice of medicine, and therefore they dispute that Appleman's ownership of MDI is inconsistent with Minnesota's CPMD.  MDI and Appleman also argue that, even if they did violate the CPMD, they could not have *known* that they violated the CPMD because the law relating to lay ownership of MRI-scanning facilities was and remains unsettled in Minnesota.  Thus, any representation that MDI or Appleman made to the insurers about compliance with the CPMD could not have been fraudulent.

Whether MDI is engaged in the practice of medicine obviously depends on what MDI does. The complaint alleges — and MDI does not dispute — that MDI employs trained MRI technicians to perform MRI scans on patients who have been referred by chiropractors. *See* Compl. ¶¶ 131-32. After the MRI scans are completed, MDI "engages the services" of radiologists "to interpret the scans performed on the patients . . . ." *Id.* ¶ 122. MDI then forwards the radiologists' reports to the referring chiropractors, who discuss the reports with their patients. *Id.* ¶¶ 25-26.

This process can be broken into two phases: (1) the taking of the MRI scan and (2) the interpretation of the MRI scan. MDI is indisputably involved in the taking of MRI scans. Almost surely, however, the taking of an MRI scan, in and of itself, does not constitute the practice of medicine for purposes of Minnesota's CPMD. Although the Minnesota Supreme Court has not directly ruled on the question, several other courts have done so, and they unanimously agree that the taking of an MRI scan does not constitute the practice of medicine for purposes of Minnesota's CPMD. *See State Farm Mut. Auto Ins. Co. v. Mobile Diagnostic Imagine, Inc.*, No. 12-CV-1056 (DSD/JJG), 2014 WL 1228958, at *2-4 (D. Minn. Mar. 25, 2014); *cf. Spine Imaging MRI, L.L.C. v. Country Cas. Ins. Co.* ("*Spine Imaging I*"), No. 10-CV-0480 (JRT/AJB), 2011 WL 379100, at *7 (D. Minn. Feb. 1, 2011) ("[T]he Court cannot conclude as a matter of law that Spine Imaging's taking of MRI scans itself violates the corporate practice of medicine doctrine."); *Stand Up Mid Am. MRI, Inc. v. Allstate Ins. Co.*, No. A09-1108, 2010 WL 1440199, at *3-5 (Minn. Ct. App. Apr. 13, 2010) (finding that corporation providing MRI scans for chiropractors could not have knowingly and intentionally violated Minnesota's CPMD).

This Court agrees with *State Farm* that the Minnesota Supreme Court is unlikely to hold that the taking of an MRI scan constitutes the practice of medicine for purposes of the CPMD. *See State Farm*, 2014 WL 1228958, at *3-4.  The State of Minnesota does not impose licensing requirements upon MRI technologists[4] — a factor that the Minnesota Supreme Court found dispositive in determining that massage therapists did not practice medicine for purposes of the CPMD.  *See Isles Wellness I*, 703 N.W.2d at 522.  Moreover, Minnesota law clearly contemplates that laypersons can possess ownership interests in corporations that perform MRI scans.  *See* Minn. Stat. § 144.565, subd. 1 ("The commissioner shall require diagnostic imaging facilities and providers of diagnostic imaging services in Minnesota to report . . . the names of all physicians with any financial or economic interest . . . and *all other individuals* with a ten percent or greater financial or economic interest in the facility . . . ." (emphasis added)).  Under these circumstances, MDI and Appleman could not possibly have known that they violated the CPMD, and thus even if they represented to the insurers that they had not violated the CPMD, they did not commit mail or wire fraud.  *See United States v. Redzic*, 627 F.3d 683, 689 & n.4 (8th Cir. 2010) (listing intent to defraud as element of mail fraud and wire fraud).

In contrast to taking MRI scans, "it is well-established that laypersons are not permitted to *interpret* MRI scans."  *State Farm*, 2014 WL 1228958, at *3 (emphasis added; citing *Stand Up Mid Am. MRI*, 2010 WL 1440199, at *1).  MDI and Appleman maintain that a close analysis of

---

[4]The complaint alleges that "the MDI technicians are members of the American Registry of Radiologic Technologists," "have passed exams approved by the Minnesota Commissioner of Health," and "are required to maintain continuing education credits."  Compl. ¶ 131.  None of this reflects a requirement imposed by *Minnesota law*, however.

the complaint reveals no allegation that MDI itself did any interpreting of the MRI scans that it performed.  The Court agrees.

The complaint alleges that the MRI scans performed by MDI were interpreted by radiologists, but the complaint is sketchy about the relationship between MDI and those radiologists — and, in particular, about whether those radiologists were employees of MDI or instead independent contractors.  This is a crucial issue.  MDI and Appleman could not have committed mail or wire fraud in the manner alleged by plaintiffs unless (1) the radiologists were employees; (2) the radiologists were independent contractors, and use of independent contractors violates the CPMD; or (3) the radiologists were independent contractors, and use of independent contractors does *not* violate the CPMD, but MDI and Appleman nevertheless violated the CPMD by interfering with the medical judgment of the radiologists.

The complaint is not clear about any of this.  To begin, nowhere in the complaint do plaintiffs plausibly allege that the radiologists were in fact employed by MDI.  The complaint alleges that MDI "engage[d] the services" of radiologists "to interpret the scans performed on the patients . . . ."  Compl. ¶ 122.  But the word "engaged" could encompass either an employment relationship or an independent-contractor relationship; indeed, it is arguably more natural to use "engaged" when referring to an independent contractor (e.g., "the homeowner engaged an interior decorator") than when referring to an employee (e.g., "the boss engaged a new secretary").  The complaint also alleges that MDI refers to the doctors who interpret the MRI scans as "our radiologists" on its website.  Compl. ¶ 25.  But the phrase "our radiologists" could easily be shorthand for "the radiologists whom we engage as independent contractors."  Customers commonly refer to "my barber" or "my plumber" or "my dentist," and yet customers

rarely employ those professionals.  In short, the complaint does not plausibly allege that MDI employed the radiologists, much less that MDI and Appleman *knew* that MDI employed the radiologists.

If the radiologists were independent contractors, then it is far from clear that MDI and Appleman violated the CPMD.  "Whether [the] use of independent contractors was and is a violation of the corporate practice of medicine doctrine — let alone a knowing and intentional violation — is far from a settled issue under Minnesota law."  *Spine Imaging I*, 2011 WL 379100, at *6 (discussing cases).  Thus, the complaint does not plausibly allege that, if the radiologists were independent contractors, MDI and Appleman knew that they were violating the CPMD.

Finally, even if the radiologists were independent contractors, MDI could still have violated the CPMD if it interfered with the judgment of those radiologists or provided the reports of those radiologists directly to patients.  *See Granger*, 250 N.W. at 723.  But the complaint does not allege that MDI or Appleman interfered with the judgment of the radiologists,[5] and the complaint acknowledges that the reports prepared by the radiologists were forwarded to the referring chiropractors, not to the patients.  *See* Compl. ¶¶ 25-26.

In sum, the complaint does not plausibly allege that MDI and Appleman were violating the CPMD, much less that they knew that they were violating the CPMD, much less that they

---

[5]The complaint does allege that the radiologists consulted by MDI "*should* enjoy unfettered independent medical judgments without the interference of a lay corporation such as Defendant MDI."  Compl. ¶ 126 (emphasis added).  But what matters for purposes of the pending motions is that the complaint never alleges that the radiologists *did not* "enjoy unfettered independent medical judgments . . . ."  *Id*.  When pressed at oral argument, plaintiffs admitted that they do not have a basis for alleging that MDI or Appleman interfered with the radiologists' independent judgment.

committed mail or wire fraud by representing to the insurers that they were not violating the CPMD.  For these reasons, plaintiffs' RICO claim is dismissed insofar as it relies on alleged violations of the CPMD.

ii.  Kickbacks

Plaintiffs next allege that MDI and Appleman paid kickbacks to chiropractors and that, in return, chiropractors referred patients to MDI and Appleman for MRI scans.  Both state and federal law prohibit such kickbacks.  *See* Minn. Stat. § 62J.23; 42 U.S.C. § 1320a-7b(b)(1). Plaintiffs contend that, had they known of the kickbacks paid by MDI and Appleman, they would not have paid any of the insurance claims submitted by MDI and Appleman for patients that were referred by chiropractors who received kickbacks — even claims for MRI scans that were medically necessary and reasonably priced.

Everyone agrees that plaintiffs were not required to pay claims for MRI scans that were not medically necessary or reasonably priced.  The Court will address that issue below.  At this point, the Court addresses only the claim of plaintiffs that they had no obligation to pay for MRI scans that *were* medically necessary and reasonably priced.

Even if plaintiffs's allegations about the operation of the kickback scheme are true (as the Court assumes), it is difficult to understand why plaintiffs would have a claim against MDI or Appleman under RICO to recover payments for MRI scans that were medically necessary and reasonably priced.  Violations of the anti-kickback statutes are not predicate acts under RICO, and plaintiffs' theory as to why a violation of the anti-kickback statutes by MDI or Appleman would constitute mail fraud or wire fraud is difficult to follow.  Again, proof of fraud requires proof of deception or dishonesty.  As best as the Court can tell, plaintiffs' theory with respect to

-20-

the kickbacks resembles their theory with respect to the CPMD:  According to plaintiffs, when MDI and Appleman submitted a claim to an insurer, they represented that they were entitled to payment of the claim.  But, say plaintiffs, MDI and Appleman knew that they were not entitled to payment of the claim because they knew that they had paid kickbacks.  Therefore, plaintiffs conclude, MDI and Appleman lied to the insurers.

The problem with this argument is that it is premised on the assumption that payment of kickbacks by MDI and Appleman automatically relieves the insurers of any obligation to pay for any claim submitted by MDI and Appleman — even claims for MRI scans that were medically necessary and reasonably priced.  But the No-Fault Act requires insurers to pay "*all* reasonable expenses" for "necessary" medical and chiropractic services.  Minn. Stat. § 65B.44, subd. 2 (emphasis added).  The Act does not make an exception for claims submitted by a health-care provider that paid kickbacks.  One of the major weaknesses of plaintiffs' case is their failure to recognize that the payment of kickbacks (on the one hand) and the medical necessity and reasonableness of the cost of an MRI scan (on the other hand) are entirely separate questions.

Even assuming that the kickback scheme functioned exactly as plaintiffs allege, the sole result of that scheme may have been that (1) chiropractors referred patients who had a medical need for MRI scans to MDI instead of to a competitor of MDI; (2) MDI properly performed the MRI scans; and (3) MDI charged a reasonable amount for the MRI scans.  Plaintiffs seem to believe that, once they prove that MDI and Appleman paid kickbacks, plaintiffs are entitled to recover every penny that they paid for scans performed by MDI.  But the fact that MDI paid kickbacks to chiropractors for referrals of patients does not in and of itself establish that any particular MRI scan performed by MDI was not medically necessary — just as it does not

establish that the amount billed by MDI for any particular scan was not reasonable.  And as long

as MDI charged reasonable amounts for medically necessary MRI scans, the plain language of

the No-Fault Act obligated plaintiffs to pay for those scans, whether or not MDI was encouraging

chiropractors to refer patients through gifts of flowers, chocolates, tickets to sporting events, or

kickbacks.  *See* Minn. Stat. § 65B.44, subd. 2.

If (as the Court has held) plaintiffs were legally obligated to pay claims for all medically

necessary and reasonably priced MRI scans regardless of whether kickbacks were involved, then

the critical fact is not whether MDI or Appleman paid kickbacks to chiropractors, but whether, as

a result of those kickbacks, chiropractors referred patients for MRI scans that were not medically

necessary.  Put another way, if every MRI scan performed by MDI was medically necessary and

reasonably priced, then plaintiffs did not pay a single penny more than they were obligated to pay

under the No-Fault Act, and MDI and Appleman did not commit mail or wire fraud by

submitting claims related to patients procured as a result of kickbacks.  To be sure, that would

not mean that the kickback scheme was *legal*, nor that MDI and Appleman should not suffer

legal consequences for the scheme.  It would simply mean that the plaintiffs in this case — a

group of insurance companies that (under the facts hypothesized by the Court) simply paid

claims submitted by MDI for medically necessary and reasonably priced MRI scans — were not

defrauded or harmed in any way.

Notwithstanding the plain language of the No-Fault Act, plaintiffs maintain that they

were not obligated to pay claims for medically necessary and reasonably priced MRI scans

conducted by MDI for two reasons:

First, plaintiffs argue that a contract made in violation of the anti-kickback statutes may be deemed void, *see Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minnesota*, 671 N.W.2d 213, 218 (Minn. Ct. App. 2003), and that the submission of insurance claims governed by contracts known to be void would be fraudulent.  But the contracts that were allegedly made in violation of the anti-kickback statutes were the "Confidential Rental Agreement[s]" between MDI and the referring chiropractors.  Plaintiffs were neither parties to nor beneficiaries of those agreements, and thus it is unclear how plaintiffs would have standing to argue that such contracts are void.  Leaving that aside, plaintiffs ignore the fact that these supposedly void contracts were not the source of the requirement that plaintiffs pay the claims submitted by MDI.  The source of that requirement was instead (1) the No-Fault Act, and (2) the insurance contracts between plaintiffs and their insureds.  In other words, even if every Confidential Rental Agreement between MDI and the chiropractors had been declared null and void, the No-Fault Act and the insurance contracts would still have obligated plaintiffs to pay for medically necessary and reasonably priced MRI scans conducted by MDI.

Second, plaintiffs point out that, under some circumstances,[6] insurers may bring actions under the No-Fault Act "to recover benefits which are not payable, but are in fact paid, because of an intentional misrepresentation of a material fact . . . ."  Minn. Stat. § 65B.54, subd. 4.  This is true, but, as just explained, plaintiffs have not adequately alleged that MDI and Appleman

---

[6]Section 65B.54 relates to the handling of claims for economic-loss benefits, and the provision cited by plaintiffs appears on its face to apply only to instances in which insurers are fraudulently induced to pay economic-loss benefits.  In this case, however, plaintiffs did not pay economic-loss benefits to MDI and Appleman; they paid claims for medical and chiropractic treatment.  Accordingly, it is doubtful that this provision even applies to this case.  *But see Viking Ins. Co.*, 1997 WL 396220, at *2 (applying § 65B.54 to claim by insurer to recover both wage-loss and medical benefits).

*made* "an intentional misrepresentation of a material fact."  Plaintiffs do not allege that either

MDI or Appleman ever explicitly represented that they had not paid kickbacks.  Instead,

plaintiffs allege that, when MDI and Appleman submitted a claim, they represented that they

were entitled to payment of that claim — and that they knew that their representation was false

because they knew that they had paid kickbacks.  Again, though, the one does not follow from

the other:  The fact that MDI and Appleman paid kickbacks does not mean that they were not

entitled to be paid for MRI scans that were medically necessary and reasonably priced.[7]

The bottom line is that MDI's submission of an insurance claim under the No-Fault Act

after performing an MRI scan on a patient who had been referred to MDI by a chiropractor who

had been paid kickbacks does not, *in and of itself*, constitute a predicate act of mail or wire fraud

for purposes of RICO.  To adequately allege a predicate act of mail or wire fraud, plaintiffs

would have to allege, at a minimum, that they were induced to pay for MRI scans that were not

medically necessary or that were not reasonably priced.  The complaint does not allege that the

scans performed by MDI were not reasonably priced.  It does, however, allege that MDI and

Appleman submitted claims for MRI scans that were not medically necessary.  The Court now

turns to that allegation.

---

[7]Plaintiffs rely heavily on *Spine Imaging MRI, L.L.C. v. Liberty Mut. Ins. Co.* ("*Spine Imaging II*"), which allowed similar claims to proceed on the basis that "had the insurers known of the illegality they allege, they would not have paid the claims."  818 F. Supp. 2d 1133, 1142 (D. Minn. 2011) (citing *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 258, 266 (D.D.C. 2002)).  The *Spine Imaging II* court did not elaborate much on this conclusion, however.  Most importantly, it did not explain what gave the insurers the right to refuse to pay claims for medically necessary and reasonably priced procedures, given the requirements of the No-Fault Act and the contracts between the insurers and their insureds.

iii.  Medical Necessity

Under the No-Fault Act, plaintiffs clearly had no obligation to pay for MRI scans that were not medically necessary.  *See* Minn. Stat. § 65B.44, subd. 2.  Without question, then, (1) if MDI and Appleman represented to an insurer that an MRI scan was medically necessary, (2) if MDI and Appleman knew that the MRI scan was, in fact, not medically necessary, and (3) if an insurer was induced to pay a claim by a knowingly false representation about medical necessity, then MDI and Appleman can plausibly be alleged to have committed mail or wire fraud.

But these are big "ifs."  In their briefing, plaintiffs tend to conflate their kickback arguments with their medical-necessity arguments.  In other words, plaintiffs frequently argue that the MRI scans conducted by MDI were not medically necessary *because* kickbacks were paid to chiropractors.  In other words, plaintiffs contend that each and every MRI scan conducted by MDI on the patient of a bribed chiropractor was not medically necessary, because each and every one of those scans was procured through kickbacks.

This argument — that not a single patient referred to MDI by a bribed chiropractor had a medical need for an MRI scan — is not plausible, and the Court has already rejected it.  As the Court has pointed out, it is entirely possible that, with respect to any particular chiropractor, the only impact of the kickbacks was to induce the chiropractor to send her patients to MDI (instead of to a competitor of MDI) for *medically necessary* MRI scans.

Plaintiffs counter that, even if some of the MRI scans conducted by MDI were medically necessary, MDI's payment of kickbacks nevertheless created an incentive for chiropractors to refer patients for medically unnecessary MRI scans.  This may be true, but plaintiffs' RICO claim is grounded in fraud, and claims of fraud require pleading "with particularity the circumstances

constituting fraud . . . ." Fed. R. Civ. P. 9(b). Plaintiffs have simply provided a list of every MRI scan performed by MDI during a five-year time period and argued, in essence, that some unknown number of these scans must have been medically unnecessary. This falls far short of what Rule 9(b) requires.

Rule 9(b) would be satisfied if, with respect to a representative sample of medically unnecessary MRI scans, plaintiffs pleaded with particularity the circumstances constituting fraud. But plaintiffs have not even attempted to plead fraud with respect to a representative sample of scans. Instead, plaintiffs have pleaded fraud with particularity with respect to only two scans: (1) a scan performed on August 9, 2011 on a patient referred to MDI by Elite Health, and (2) a scan performed on February 9, 2010 on a patient referred to MDI by Boke. *See* Compl. ¶¶ 64-65. Even with respect to these two scans, however, the complaint fails to adequately plead that the scans were medically unnecessary.

Of course, the conclusory statement that the scans were medically unnecessary is not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679. Plaintiffs must allege facts that, if proved, would show that the scans were not medically necessary. But the complaint is devoid of such facts. With respect to the scan on the patient referred by Elite Health, plaintiffs mention only that the scan was conducted within six days of the patient's car accident and that the patient's chiropractic records do not mention the results of the MRI scan. But the fact that a patient would be referred for an MRI scan shortly after being in a car accident is not the slightest bit suspicious; after all, one of the main reasons to refer a patient for an MRI scan is to diagnose the injuries that she suffered. Moreover, the failure by Elite Health to mention the results of the MRI scan in its records, taken alone, does not create a plausible inference that the MRI scan was

not medically necessary.  This Court has read thousands upon thousands of pages of medical records, and it is the rare set of medical records that does *not* suffer from gaps or omissions.

The allegations regarding the MRI scan performed on the patient referred by Boke are similarly implausible.  Plaintiffs allege that the patient was referred to MDI by Boke "even though the patient had essentially been discharged from any further chiropractic treatment." Compl. ¶ 65.  Leaving aside the ambiguity introduced by the word "essentially" — at what point in a patient's course of treatment is the patient "essentially" discharged? — plaintiffs have failed to explain why the fact that an MRI scan was conducted near or at the end of a patient's treatment is suspicious.  Medical tests (including MRI scans) are often ordered near or at the conclusion of treatment to confirm that no further treatment is necessary.

There is an additional problem with plaintiffs' complaint in the specific context of RICO. Under that statute, plaintiffs are required to show a "*pattern* of racketeering activity."  18 U.S.C. § 1962(c) (emphasis added).  This requires, at a minimum, the pleading of two predicate acts by an enterprise.  *See* 18 U.S.C. § 1961(5).  Thus, plaintiffs must plead the existence of two or more predicate acts by each of the 13 association-in-fact enterprises.  According to the complaint, Elite Health and Boke belong to separate enterprises.  *See* Compl. ¶¶ 143-44.  Even assuming that the two specific examples of medically unnecessary scans were sufficiently pleaded (and they were not), the complaint does not provide a basis for concluding that either Poser's enterprise or Boke's enterprise engaged in a *pattern* of submitting claims for medically unnecessary scans, as the complaint mentions only one such medically unnecessary scan attributable to each enterprise. And as to the other 11 association-in-fact enterprises, plaintiffs have not even attempted to plead a specific instance of a medically unnecessary scan.

Finally, because the allegations regarding medical necessity are grounded in fraud, plaintiffs must show that MDI and Appleman *knew* that the claims that they submitted were for medically unnecessary MRI scans.  But plaintiffs have not plausibly alleged how MDI or Appleman could have known whether any particular scan was or was not medically necessary.[8] In fact, plaintiffs conceded at oral argument that it is unlikely that MDI or Appleman would know — one way or the other — whether any particular MRI scan was medically necessary. Without such knowledge, MDI and Appleman could not have committed fraud.

In sum:  Plaintiffs have not pleaded with Rule 8(a) plausibility or Rule 9(b) particularity a single specific instance in which MDI and Appleman submitted a claim for an MRI that they knew to be medically unnecessary.  Because plaintiffs have failed to adequately allege the commission of even one predicate act of mail or wire fraud, plaintiffs' RICO claim must be dismissed.

### b. Enterprise

Plaintiffs' RICO claim must be dismissed for a second reason:  Plaintiffs have failed to allege that any of the defendants conducted an enterprise that was distinct from the alleged pattern of racketeering activity.

"[A]n association-in-fact enterprise must have at least three structural features:  a purpose, relationships among those associated with the enterprise, and longevity sufficient to

---

[8]Under Rule 9(b), "intent, knowledge, and other conditions of a person's mind may be alleged generally."  Still, where knowledge or intent are necessary components of a claim, Rule 8(a) requires that those components be plausibly alleged.  *See United States ex rel. Pilecki-Simko v. Chubb Inst.*, 443 Fed. Appx. 754, 759 (3d Cir. 2011) ("Rule 9 does not give [a plaintiff] license to evade the less rigid — though still operative — strictures of Rule 8 . . . ." (quotations and citations omitted; alteration in original)).

permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938,

946 (2009).  Under longstanding Eighth Circuit precedent, an alleged RICO enterprise must also

have "'an ascertainable structure distinct from the conduct of a pattern of racketeering.'" *Crest*

*Constr. II*, 660 F.3d at 354 (quoting *United States v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004)); *see*

*also United States v. Bledsoe*, 674 F.2d 647, 664 (8th Cir. 1982) ("[A]n enterprise cannot simply

be the undertaking of the acts of racketeering, neither can it be the minimal association which

surrounds these acts.").[9]  Whether the enterprise has a structure that is distinct from the pattern of

racketeering activity turns on whether the enterprise would still exist if the racketeering activity

were absent.  See *Crest Constr. II*, 660 F.3d at 354-55 (citing *Handeen v. Lemaire*, 112

F.3d 1339, 1352 (8th Cir. 1997)); *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 770 (8th Cir.

1992) ("The focus of the inquiry is whether the enterprise encompasses more than what is

necessary to commit the predicate RICO offense.").

   Plaintiffs have *not* alleged that all of the defendants to this lawsuit were involved in a

single association-in-fact enterprise.  Had plaintiffs alleged such an enterprise, that enterprise

would have taken the form of a rimless hub-and-spokes organization, with MDI and Appleman

representing the hub, and each bribed chiropractor and his or her clinic representing a spoke.

This is true because the defendant chiropractors and clinics are directly connected only to MDI

and Appleman, and not to each other (hence the lack of a "rim").  "Although the Eighth Circuit

has not addressed the issue, the Third Circuit and several district courts have reasoned that a

---

[9]Lower courts disagree about whether the Eighth Circuit's requirement of an ascertainable
structure distinct from the pattern of racketeering activity survived *Boyle*.  In *Sebrite Agency, Inc.
v. Platt*, 884 F. Supp.2d 912, 919 n.4 (D. Minn. 2012), this Court concluded that the Eighth
Circuit continues to require such "distinctness."

rimless hub-and-spokes organization does not qualify as an association-in-fact enterprise."

*Target Corp. v. LCH Pavement Consultants, LLC*, No. 12-CV-1912 (JNE/JJK), 2013

WL 2470148, at *4 (D. Minn. June 7, 2013) (citing *In re Ins. Brokerage Antitrust Litig.*, 618

F.3d 300, 374 (3d Cir. 2010)).   "This is because without a 'rim,' there are no allegations of

concerted actions among the spokes, only allegations of parallel conduct."   *Id*.

Instead of alleging a single rimless hub-and-spokes organization, plaintiffs allege

13 separate association-in-fact enterprises.   *See* Compl. ¶¶ 142-55.   Each of those enterprises is

comprised of MDI and Appleman, one or more chiropractors, and one or more chiropractic

clinics.   *Id*.   One of those 13 enterprises is comprised of MDI, Appleman, Poser, Elite Health,

and Affinity Health.   *Id*. ¶ 143.   Another is comprised of MDI, Appleman, Boke, and Assiat Boke

Chiropractic, P.A.   *Id*. ¶ 144.

The underlying allegations regarding each enterprise are the same.   In each instance, say

plaintiffs, the defendants "devised schemes to defraud Plaintiffs by requesting reimbursement for

medically unnecessary scans and/or scans incentivized by the payment of kickbacks from

Defendants MDI and Appleman to" the defendant chiropractors and clinics.   *Id*. ¶ 161.   But

plaintiffs fail to allege facts showing that any of the alleged association-in-fact enterprises are

distinct from the predicate acts of mail or wire fraud committed by those enterprises.

Plaintiffs are the victims of their own overreaching.   According to plaintiffs, every single

payment for every single claim for every single MRI scan for every single patient referred to MDI

by a bribed chiropractor was fraudulently induced.   As plaintiffs would have it, not one referral

— not one scan — not one claim — was legitimate.   *See* Compl. Ex. 7.   And thus, if the

allegations of the complaint are true, the relationship between MDI and Appleman (on the one

hand) and the defendant chiropractors and clinics (on the other hand) was made up entirely of fraud.[10]

Without that alleged fraud, then, there would be no enterprise.[11]  Plaintiffs's failure to allege that any of the defendants conducted an enterprise that was distinct from the alleged pattern of racketeering activity provides a second basis for dismissing plaintiffs' RICO claim. *See Sebrite Agency*, 884 F. Supp. 2d at 918-20.

### 2. Federal Anti-Kickback Statute (Count One)

Plaintiffs also bring a claim for violations of the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(1).  *See* Compl. ¶¶ 108-18.  That statute does not provide a private cause of action, however.  *See Spine Imaging II*, 818 F. Supp. 2d at 1140 (collecting cases).  Thus, insofar as plaintiffs assert a cause of action under the statute, plaintiffs' claim is dismissed with prejudice.

The federal anti-kickback statute can, however, serve as a guidepost for other causes of action.  For example, "[a] contract may be deemed illegal if it violates the federal anti-kickback statute."  *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 671 N.W.2d 213, 217 (Minn. Ct. App. 2003).  In that instance, the plaintiff would not be pursuing a cause of action under the anti-kickback statute; rather, the plaintiff would be pursuing a cause of action under

---

[10]At oral argument, plaintiffs suggested that the alleged enterprises retained a structure separate from the underlying fraud because the defendant chiropractors also referred patients whose automobile insurance was issued by insurers other than plaintiffs, and plaintiffs are not challenging claims related to those referrals.  But on the logic of plaintiffs' complaint, every one of those claims was as much the product of fraud as the claims submitted to plaintiffs.

[11]To be clear:  *Components* of each alleged enterprise have separate structures and engage in legitimate activities.  For example, the defendant chiropractors undoubtedly do something other than make fraudulent referrals to MDI (such as treat patients).  But the *enterprise itself* — that is, the thing that *connects* or that is *made up* of the component parts — does nothing except engage in fraud, according to the complaint.

state common law, and state common law, in turn, would provide that contracts that violate federal law cannot be enforced. To the extent that plaintiffs are pursuing such a claim, their claim arises under Minnesota law, and it is addressed below (along with plaintiffs' other state-law claims).

### D.  State-Law Claims

#### 1.  Jurisdiction

The Court has dismissed the only two federal claims raised in the complaint — the RICO claim and the claim under the federal anti-kickback statute. The Court undoubtedly has jurisdiction over those federal claims under 28 U.S.C. § 1331. The Court does not have jurisdiction over the remaining state-law claims unless (1) a basis for original jurisdiction exists, such as diversity jurisdiction under 28 U.S.C. § 1332(a), or (2) the Court exercises supplemental jurisdiction under 28 U.S.C. § 1367.

Under § 1332(a), "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states . . . ." No plaintiff is a citizen of a state of which any defendant is a citizen, so complete diversity exists. *See* Compl. ¶¶ 6-8, 11, 20-21, 31-34. As a result, this Court has original jurisdiction over any state-law claim for more than $75,000.

The complaint alleges that § 1332(a) provides a basis for jurisdiction only as to the claims brought by Illinois Farmers against MDI, Appleman, Poser, and Poser's clinics (Elite Health and Affinity Health). *See* Compl. ¶ 3. In other words, the complaint tacitly acknowledges that the amount-in-controversy requirement is not met with respect to any of the claims brought by 21st

Century or Bristol West against any of the defendants.  Likewise, the complaint tacitly acknowledges that the amount-in-controversy requirement is not met with respect to any of the claims brought by Illinois Farmers against any of the other defendant chiropractors or clinics, save MDI, Appleman, and the Poser defendants.

Plaintiffs confirm in their briefing that the amount-in-controversy requirement is not met with respect to all claims brought against Boke and Assiat Boke Chiropractic, P.A.  *See* ECF No. 140 at 5 n.2.  Thus, the Court would have to exercise supplemental jurisdiction over those claims.  But the Eighth Circuit has made clear that, when a district court dismisses all of the federal claims in a complaint before trial, the district court should decline to exercise supplemental jurisdiction over the remaining state-law claims.  *See Hervey v. County of Koochiching*, 527 F.3d 711, 726-27 (8th Cir. 2008).  Accordingly, all of the state-law claims against Boke and Assiat Boke Chiropractic, P.A. are dismissed without prejudice.

Conversely, plaintiffs appear to contend in their briefing that the amount-in-controversy requirement is met with respect to the claims brought by *all three plaintiffs* against Poser, Elite Health, and Affinity Health.  *See* ECF No. 140 at 3. This is an about-face from the complaint, which alleges that diversity jurisdiction exists only with respect to the claims brought by Illinois Farmers.  *See* Compl. ¶ 3.  Plaintiffs assert in their briefing that "[t]he Complaint clearly articulates that Plaintiffs are seeking $78,730.48 from Defendant Poser."  ECF No. 140 at 3. This is literally true, but deceptive.  The *combined* amount in controversy for the claims brought by the three plaintiffs against Poser amounts to $78,730.48.  *See* Compl. Ex. 7 at 1-3 (enumerating insurance claims submitted by MDI for patients referred by Poser, Elite Health, and Affinity Health).  But the amount in controversy *as to each plaintiff* does not exceed $75,000.

-33-

*See Crawford v. F. Hoffman-La Roche Ltd.*, 267 F.3d 760, 765 (8th Cir. 2001) ("The separate and distinct claims of two or more plaintiffs cannot be aggregated except in cases where the plaintiffs 'unite to enforce a single title or right in which they have a common and undivided interest.'") (quoting *Snyder v. Harris*, 394 U.S. 332, 335 (1969)).  Indeed, the amount in controversy between 21st Century (on the one hand) and Poser, Elite Health, and Affinity Health (on the other hand) appears to be zero.[12]  It is therefore difficult to see how more than $75,000 could be in controversy between 21st Century and the Poser defendants (or, for that matter, how 21st Century could have a good-faith basis for bringing any claims whatsoever against Poser, Elite Health, or Affinity Health).

Bristol West did pay some claims submitted by MDI for services provided to patients of Poser, Elite Health, or Affinity Health.  Compl. Ex. 7.  But the sum of those claims was $9,698. *Id.*  It is difficult to see how more than $75,000 could be in controversy between Bristol West and the Poser defendants.

And finally, notwithstanding the allegations of the complaint, *see* Compl. ¶ 3, the claims of Illinois Farmers against the Poser defendants do not seem to meet the amount-in-controversy requirement.  As just explained, plaintiffs are crystal clear in their briefing that they *as a group* are seeking $78,730.48 from Poser, Elite Health, and Affinity Health.  *See* ECF No. 140 at 3-5; Compl. Ex. 7.  But $9,698 of that amount relates to claims submitted by MDI to Bristol West for Poser's patients, leaving only $69,032.48 relating to claims submitted by MDI to Illinois Farmers for Poser's patients.  Thus, the amount-in-controversy requirement is not met even with respect

---

[12]According to the materials attached to the complaint, MDI did not submit a single claim to 21st Century for any patient referred by Poser, Elite Health, or Affinity Health.  *See* Compl. Ex. 7.

to the claims of Illinois Farmers.  For the reasons already described, the Court declines to exercise supplemental jurisdiction over those claims, and thus all of the state-law claims against Poser, Elite Health, and Affinity Health are dismissed without prejudice.

Finally, with respect to the claims brought against MDI and Appleman:  The claims brought by Illinois Farmers against MDI and Appleman unquestionably meet the amount-in-controversy requirement of § 1332(a).  *See* Compl. Ex. 7.  The complaint does not allege that diversity jurisdiction exists as to the claims brought by 21st Century and Bristol West against MDI and Appleman, *see* Compl. ¶ 3, and plaintiffs have not submitted any evidence that the amount-in-controversy requirement is met with respect to those claims.  Thus, the Court dismisses without prejudice all of the state-law claims brought against MDI and Appleman by 21st Century and Bristol West.

The Court now turns to the merits of the only state-law claims left in the lawsuit — that is, the state-law claims brought by Illinois Farmers against MDI and Appleman.

## 2.  Remaining State-Law Claims

The allegations underlying Illinois Farmers's state-law claims against MDI and Appleman are very similar to the allegations underlying plaintiffs' RICO claim.  Unsurprisingly, then, the state-law claims against MDI and Appleman fail for many of the reasons that the RICO claim failed.  The Court will proceed briefly through each state-law claim.

### a.  Violation of State Anti-Kickback Statute (Count One)

Illinois Farmers brings a claim under Minnesota's anti-kickback statute.  *See* Minn. Stat. § 62J.23.  This claim is dismissed with prejudice, as it is clear that there is no private right of action under that statute.  *See Spine Imaging II*, 818 F. Supp. 2d at 1140.

As explained above, Illinois Farmers also brings a claim in which it asserts, in essence, that a contract that violates the federal or state anti-kickback statutes is void under Minnesota common law.  But as also explained above, Illinois Farmers has not adequately alleged how the payment of kickbacks by MDI and Appleman caused Illinois Farmers to pay any insurance claim that it was not obligated to pay under the No-Fault Act and under its contracts with its insureds.  Accordingly, this claim is dismissed.

### b.  Common-Law Fraud and No-Fault Fraud (Counts Four and Nine)

Count Four asserts a claim of common-law fraud and Count Nine asserts a materially indistinguishable claim of No-Fault Fraud.  In both counts, Illinois Farmers alleges that MDI and Appleman fraudulently induced it to pay insurance claims that it otherwise would not have paid.  These fraud allegations have already been fully explored and found inadequate in conjunction with plaintiffs' RICO claim.  For the same reasons, the Court finds that Illinois Farmers has not adequately pleaded its state-law fraud claims.  Counts Four and Nine are therefore dismissed as to MDI and Appleman.

### c.  Negligent Misrepresentation (Count Ten)

"The elements of a negligent misrepresentation claim are similar to fraud."  *Provell,*

*Inc. v. JetChoice I, LLC*, No. A10-2255, 2011 WL 2750717, at *2 n.2 (Minn. Ct. App. July 18,

2011).  Under Minnesota law,

> A person makes a negligent misrepresentation when (1) in the
> course of his or her business, profession, or employment, or in a
> transaction in which he or she has a pecuniary interest, (2) the
> person supplies false information for the guidance of others in their
> business transactions, (3) another justifiably relies on the
> information, and (4) the person making the representation has
> failed to exercise reasonable care in obtaining or communicating
> the information.

*Id*.  Illinois Farmers argues that MDI and Appleman failed to use reasonable care when they

represented — through their submission of CMS 1500 forms — that they were entitled to

reimbursement under the No-Fault Act.

There are two problems with this claim:

First, the negligent-misrepresentation claim relies not on the submission of *false*

information, but on the omission of *true* information from the CMS 1500 forms — specifically,

the failure of MDI and Appleman to write onto each CMS 1500 form something like "we are

violating the CPMD" or "we pay kickbacks to chiropractors."  For an omission of a fact to

constitute a negligent misrepresentation, "there must first be a duty, either legal or equitable, to

disclose that fact."  *Hurley v. TCF Banking & Sav., F.A.*, 414 N.W.2d 584, 587 (Minn. Ct. App.

1987) (citing *Richfield Bank & Trust Co. v. Sjogren*, 244 N.W.2d 648, 650 (Minn. 1976)).  It is

far from clear, however, that either MDI or Appleman had a duty to disclose the missing information to Illinois Farmers.[13]

Second, Illinois Farmers has not adequately alleged that it detrimentally relied on the misleading-by-omission CMS 1500 forms.  The Court has already held that Illinois Farmers has not adequately alleged that it had the right to refuse to pay claims because MDI was owned by Appleman or because MDI and Appleman violated the CPMD in some other way.  The Court has also held that the fact that MDI and Appleman paid kickbacks to referring chiropractors would not have allowed plaintiffs to avoid paying claims for medically necessary and reasonably priced MRI scans.  Finally, the Court has held that Illinois Farmers has not adequately alleged that any MRI scan performed by MDI and Appleman was medically unnecessary, much less that MDI and Appleman knew that the scan was medically unnecessary.  Accordingly, Illinois Farmers's negligent-misrepresentation claim against MDI and Appleman is dismissed.

---

[13]Indeed, MDI and Appleman may have been *foreclosed* from submitting such information on the CMS 1500 form.  Minnesota law provides that "all noninstitutional health care services . . . must be billed using the health insurance claim form CMS 1500 . . . ." Minn. Stat. § 62J.52, subd. 2(a) (2008).  Those forms undoubtedly provide a floor — i.e., a heath-care provider must provide no less than the information required to fill out the CMS 1500 form.  But those forms might also provide a ceiling.  After all, one reason for the requirement that all claims be submitted on CMS 1500 forms is to expedite claims processing by ensuring that claimants provide in a uniform format only the information needed by insurers to process their claims.  *Cf.* Minn. Stat. § 62J.50, subd. 2 ("The legislature finds that significant savings throughout the health care industry can be accomplished by implementing a set of administrative standards and simplified procedures and by setting forward a plan toward the use of electronic methods of data interchange.").  Imposing a duty on healthcare providers to submit information in addition to what is required by the CMS 1500 form would arguably undercut that rationale.

### d.  Consumer Fraud (Count Eight)

Under Minnesota law, "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise . . . is enjoinable . . . ."  Minn. Stat. § 325F.69, subd. 1.  Although the Minnesota Attorney General is primarily charged with enforcing this statute, *see* Minn. Stat. § 8.31, subd. 1, a private party may in some instances act as a so-called private attorney general and "bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court."  Minn. Stat. § 8.31, subd. 3a.

There are two facets to Illinois Farmers's consumer-fraud claim.  The first facet of the consumer-fraud claim is familiar:  Illinois Farmers bases yet another fraud allegation on the alleged violation of the CPMD by MDI and Appleman and on the kickback scheme.  *See* Compl. ¶ 227.  The Court has already explained why these fraud claims have not been adequately pleaded.

The second facet of the consumer-fraud claim differs from Illinois Farmers's other claims, as it relates to MDI's and Appleman's misrepresentations not to Illinois Farmers, but to *insured patients*.  These alleged misrepresentations include not only allegedly false statements made to patients (such as the statement on MDI's website that the radiologists engaged by MDI were "our radiologists"), but also the omission of material facts from literally true statements made to patients (such as omission of the fact that Appleman was a layperson and the fact that the MRI scans were not medically necessary).  *See* Compl. ¶ 232.

This facet of the consumer-fraud claim fails for the same reasons that the other fraud claims fail.  Briefly:  When MDI used the phrase "our radiologists" on its website, it was not committing fraud, because it was not clearly stating that the radiologists were employees or that the radiologists were independent contractors.  The complaint does not plausibly allege that MDI or Appleman violated the CPMD.  And the complaint does not adequately allege that any MRI scan performed by MDI and Appleman was medically unnecessary.

Moreover, "individuals who bring a cause of action pursuant to [§ 8.31] must show that the action is brought to benefit the public."  *Overen v. Hasbro, Inc.*, No. 07-CV-1430 (RHK/JSM), 2007 WL 2695792, at *2 (D. Minn. Sept. 12, 2007) (citing *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000)).  "To determine whether a lawsuit is brought for the public benefit the Court must examine not only the form of the alleged misrepresentation, but also the relief sought by the plaintiff."  *Zutz v. Case Corp.*, No. 02-CV-1776 (PAM/RLE), 2003 WL 22848943, at *4 (D. Minn. Nov. 21, 2003).  "Where recovery is sought for the exclusive benefit of the plaintiff, there is no public benefit."  *Id.*

Illinois Farmers primarily seeks compensatory damages, costs, and attorney's fees in connection with its consumer-fraud claim.  *See* Compl. ¶ 233.  Recovery of these amounts by Illinois Farmers would not benefit the public; it would simply compensate Illinois Farmers for its alleged losses.  And although Illinois Farmers has grafted a request for "an injunction prohibiting Defendants MDI and Appleman from conducting MRI scans" onto the complaint, Compl. ¶ 234, this relief is at best incidental to the request for monetary damages.  Moreover, it is difficult to understand how enjoining MDI and Appleman from conducting MRI scans would benefit the public.  No one claims that there was anything wrong with the MRI scans that MDI and

Appleman performed, save for the wholly inadequate allegation that some unknown number of those scans were medically unnecessary.

Because Illinois Farmers has not adequately alleged the existence of consumer fraud and primarily seeks to benefit itself rather than the public, its consumer-fraud claim is dismissed.

*e. Violation of the CPMD (Count Two)*

Illinois Farmers brings a direct claim for violation of the CPMD against MDI and Appleman.  This CPMD claim differs slightly from the CPMD allegations that relate to the RICO claim.  The RICO claim is, at heart, a fraud claim; the allegation is that MDI and Appleman lied about their violation of the CPMD.  *See* Compl. ¶¶ 161-62.  The direct claim for violation of the CPMD is, at heart, a contract claim; the allegation is that the enforcement of contracts involving MDI and Appleman would violate public policy because MDI and Appleman violated the CPMD.

That said, the direct claim is no more viable than the RICO claim.  Contracts made in violation of the CPMD are not voidable "unless it is established that the corporation's actions show a knowing and intentional" violation of the CPMD.  *Isles Wellness II*, 725 N.W.2d at 95.  Leaving aside the fact that Illinois Farmers did not enter into contracts with MDI or Appleman — and probably lacks standing to use the CPMD to void contracts to which it is neither a party nor beneficiary — Illinois Farmers has not alleged facts that, if proved, would show that MDI or Appleman knowingly and intentionally violated the CPMD.  Thus, any violation of the CPMD cannot form the basis for voiding any contract to which MDI or Appleman is a party.  Count Two is therefore dismissed.

*f. Unjust Enrichment (Count Fourteen)*

No kitchen-sink complaint would be complete without an unjust-enrichment claim.

"The elements of an unjust enrichment claim" under Minnesota law "are:  (1) a benefit conferred; (2) the defendant's appreciation and knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit under such circumstances that it would be inequitable for him to retain it without paying for it."  *Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195 (Minn. Ct. App. 2007).  Because the unjust-enrichment claim pleaded by Illinois Farmers is ultimately grounded in fraud, *see* Compl. ¶ 274, the heightened pleading standard of Rule 9(b) applies to that claim, *see Chin v. General Mills, Inc.*, No. 12-CV-2150 (MJD/TNL), 2013 WL 2420455, at *8 (D. Minn. June 3, 2013) (citing *Khoday v. Symantec Corp.*, 858 F. Supp. 2d 1004, 1010 n.5 (D. Minn. 2012)).

Illinois Farmers has not adequately alleged how any benefit retained by MDI or Appleman was unjust.  Again:  MDI and Appleman could not have known that Appleman's ownership of MDI violated the CPMD; the complaint does not plausibly allege that MDI and Appleman violated the CPMD in some other way; the payment of kickbacks, in and of itself, did not relieve Illinois Farmers of its duty under the No-Fault Act and its contracts with its insureds to pay claims for medically necessary MRI scans; and Illinois Farmers has not alleged with particularity any instance in which MDI knowingly submitted a claim for an MRI scan that was not medically necessary.  Accordingly, the unjust-enrichment claim is dismissed.

### g.  Civil Conspiracy (Count Twelve)

Illinois Farmers alleges that MDI and Appleman entered into a conspiracy to commit fraud with the defendant chiropractors and defendant clinics.  This claim, like almost all civil-conspiracy claims, is pointless, as "[a] claim of civil conspiracy must be supported by an underlying tort." *Hong Chen v. Mar*, No. A10-1908, 2011 WL 2119406, at *5 (Minn. Ct. App. May 31, 2011) (citing *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997)); *cf. Harding v. Ohio Cas. Ins. Co.*, 41 N.W.2d 818, 824 (Minn. 1950).  If the defendant committed an underlying tort, then the plaintiff can generally recover damages for that tort.  And if the defendant did not commit an underlying tort, then the plaintiff cannot recover for civil conspiracy.

As the Court has explained at length, Illinois Farmers has not adequately pleaded that MDI or Appleman committed fraud — or, for that matter, that they committed any other tort.  Thus, Illinois Farmers has not adequately pleaded its civil-conspiracy claim.  That claim is dismissed.

### h.  Piercing the Corporate Veil (Count Thirteen)

Illinois Farmers next alleges that MDI is merely the alter ego of Appleman, and that the Court should pierce the corporate veil and hold Appleman personally liable for MDI's wrongdoing.  *See Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., Inc.*, 283 N.W.2d 509, 512 (Minn. 1979) (setting forth the requirements for alter-ego liability under Minnesota law).  But because Illinois Farmers has not adequately pleaded any claim against MDI, it necessarily has not adequately pleaded its veil-piercing claim against Appleman.  Moreover, even if Illinois Farmers had adequately pleaded a claim against MDI, it has not

pleaded facts making plausible its claim that MDI is merely an alter ego of Appleman. The veil-piercing claim is dismissed.

### i. Fraudulent Concealment (Counts Five and Six)

Finally, Illinois Farmers alleges that Appleman's and MDI's fraudulent concealment of their wrongdoing should result in the tolling of the statute of limitations for the claims raised in the complaint. This fraudulent-concealment claim obviously depends on the existence of an underlying cause of action against MDI and Appleman. Illinois Farmers has not adequately pleaded such an underlying cause of action, and thus it has not adequately pleaded a claim of fraudulent concealment. The fraudulent-concealment claims are dismissed.

### E. Conclusion

For the reasons explained above, all claims against the moving defendants must be dismissed. All of the state-law claims brought by 21st Century and Bristol West must be dismissed without prejudice for lack of jurisdiction. All of the state-law claims brought by Illinois Farmers against Poser, Elite Health, Affinity Health, Boke, and Assiat Boke Chiropractic likewise must be dismissed without prejudice for lack of jurisdiction. The only remaining issue is whether dismissal of the federal claims against the moving defendants, and dismissal of Illinois Farmers's state-law claims against MDI and Appleman, should be with or without prejudice. That question turns on whether an amendment of the complaint would be futile. *See Teinert v. Abdallah*, 435 Fed. Appx. 566, 567 (8th Cir. 2011) (citing *Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 782 (8th Cir. 2009)).

Plaintiffs' federal claims against the moving defendants — and Illinois Farmers's state-law claims against MDI and Appleman — are founded on three allegations: (1) that MDI and

Appleman knowingly violated the CPMD; (2) that the payment of kickbacks by MDI and Appleman excused plaintiffs from having to pay claims for medically necessary and reasonably priced MRI scans; and (3) that MDI and Appleman submitted claims for MRI scans that were not medically necessary. The Court has already explained at length how plaintiffs have failed to state a claim upon which relief can be granted as to every claim based on one of these allegations. The question is whether there is any possibility that plaintiffs could file an amended complaint that would fix the problems cited by the Court.

First, given the state of the law, plaintiffs cannot possibly show that MDI and Appleman knowingly violated the CPMD simply by virtue of the fact that Appleman owned MDI. Thus, to the extent that any claim is predicated *only* on Appleman's ownership of MDI, that claim is dismissed with prejudice. At the same time, it is conceivable (albeit unlikely[14]) that plaintiffs might be able to show that MDI and Appleman violated the CPMD by employing the radiologists who interpreted the MRI scans or by interfering with the medical judgment of those radiologists. Thus, to the extent that any claim is predicated on the allegation that MDI and Appleman violated the CPMD in one of these two ways, that claim is dismissed without prejudice.

Second, the Court has held that the payment of kickbacks by MDI and Appleman did not excuse plaintiffs from their obligation under the No-Fault Act and under their contracts with their insureds to pay for MRI scans that were medically necessary and reasonably priced. The Court has further held that neither the federal nor state anti-kickback statute provides a private cause of

---

[14]*See State Farm*, 2014 WL 1228958, at *4-5 (granting MDI's motion for summary judgment on similar claims of violations of the CPMD).

action.  Thus, to the extent that any claim is predicated *only* on the payment of kickbacks by MDI and Appleman, that claim is dismissed with prejudice.

Third, if plaintiffs could plead with Rule 8(a) plausibility and Rule 9(b) particularity that MDI and Appleman submitted claims for MRI scans that they knew to be medically unnecessary, one or more of plaintiffs' claims might survive.  The Court has held that plaintiffs have failed to adequately plead that any MRI scan was medically unnecessary; this, of course, could be remedied in an amended complaint.  The Court has also held that plaintiffs have failed to adequately plead that MDI or Appleman *knew* that any MRI scan was medically unnecessary; this, too, could be remedied in an amended complaint, although common sense suggests that plaintiffs are going to have a hard time proving that MDI or Appleman knew that a particular patient did not, in fact, need a particular MRI scan.  Accordingly, to the extent that any claim is predicated on the allegation that MDI and Appleman submitted claims for MRI scans that they knew to be medically unnecessary, that claim is dismissed without prejudice.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    The motion to dismiss of defendants Steve Poser, D.C.; Assiat Boke, D.C.; Affinity Health Chiropractic, P.A.; Assiat Boke Chiropractic, P.A.; and Elite Health Chiropractic, P.C. [ECF No. 108] is GRANTED.

   a.    Counts One and Three are DISMISSED IN PART WITH PREJUDICE and DISMISSED IN PART WITHOUT PREJUDICE as to those defendants, as explained in the body of this order.

     b.     Counts Seven, Eight, Eleven, Twelve, Thirteen, and Fourteen are

     DISMISSED WITHOUT PREJUDICE as to those defendants.

2.     The motion to dismiss of defendants Mobile Diagnostic Imaging, Inc. and

Michael A. Appleman [ECF No. 112] is GRANTED.  The complaint is

DISMISSED IN PART WITH PREJUDICE and DISMISSED IN PART

WITHOUT PREJUDICE as to those defendants, as explained in the body of this

order.

Dated: August  19, 2014                s/Patrick J. Schiltz_____
                                                Patrick J. Schiltz
                                                United States District Judge